# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| CLEAN HARBORS SERVICES, INC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 12-CV-7837 |
| | ) | |
| THE ILLINOIS INTERNATIONAL, | ) | |
| PORT DISTRICT, | ) | Judge Thomas M. Durkin |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Clean Harbors Services, Inc. ("Clean Harbors") brought this action against Defendant The Illinois International Port District ("Port District") asserting claims under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9607, 9613, the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972, and state law. Presently before the Court is the Port District's Motion to Dismiss Counts II, III, and VIII of Clean Harbors' Third Amended Complaint. For the reasons explained below, the Port District's motion is granted in part and denied in part.

## BACKGROUND[1]

This case involves contaminated property located at 11700 and 11800 South Stony Island in Chicago, Illinois (the "property"). R. 108 ¶ 1. The Port District has

---

[1] Additional background of this case is set forth in the Court's February 25, 2013 order, R. 27. In that order, the Court granted the Port District's motion to dismiss Clean Harbors' Resource Conservation and Recovery Act ("RCRA") claims and also dismissed the Port District's RCRA counterclaim because neither party had provided the proper pre-suit notice required by the RCRA. *Id.* (*Clean Harbors Servs., Inc. v. Illinois Int'l Port Dist.,* 2013 WL 678271 (N.D. Ill. Feb. 25, 2013).

owned the property since 1955. In the 1960s and 1970s, the Port District began to construct piers on the property with fill materials consisting of industrial waste, construction debris, natural material, and a mixture of soil, steel industry wastes, and pea-sized gravel. *Id*. ¶¶ 27, 30, 31. Also in the 1970s, the Port District leased the property to a now-dissolved company, Hyon Waste Management Services, Inc. *Id*. ¶ 36. Hyon Waste operated a series of surface impoundments at the property for the treatment, storage, and disposal of hazardous wastes and disposed of tens of millions of gallons of waste. Clean Harbors alleges that the Port District, as the owner of the property, knew or reasonably should have known of Hyon Waste's contamination but did nothing to abate the contamination or hold Hyon Waste accountable for the contamination. *Id*. ¶ 51.

Beginning in the 1980s, the Port District leased the property to two different companies, ChemClear, Inc. and CMW Chemical Services, Inc., both of which Clean Harbors later acquired. (Throughout this Order, the Court refers to Clean Harbors and these companies collectively as "Clean Harbors.") Clean Harbors operated a waste processing facility at the property that processed hazardous wastes for disposal or recycling at offsite locations. Clean Harbors and the Port District are co-permittees on permits issued by the Illinois Environmental Protection Agency ("IEPA"). One such permit is a RCRA Part B permit, which was originally issued on November 4, 2005 and expired on December 9, 2015 (the "Permit"). The IEPA renewed the Permit effective September 6, 2017. R. 108 ¶ 197.

The IEPA eventually directed the Port District and Clean Harbors to conduct a RCRA facility investigation of the property. The parties performed the investigation and discovered contamination primarily related to Hyon Waste's operations in the 1970s. R. 108 ¶¶ 89–99. Clean Harbors incurred substantial costs to conduct the investigation. *Id*. ¶ 150. The Port District and Clean Harbors subsequently worked with the IEPA to develop a corrective action plan to address the contamination (known as the "Cap and Drain Plan"). IEPA gave its final approval for the plan in 2011. *Id*. ¶ 123. The IEPA's plan required that an existing cover at the property remain in place as an engineered barrier, required the construction of a french drain, and required future groundwater monitoring at the property. The Plan is projected to cost $5.75 million in construction costs and an additional $ 2.15 million in monitoring costs. *Id*. ¶ 151.

In 2012, Clean Harbors provided notice of its intent to terminate its leases on the property and identified issues related to the Cap and Drain Plan that needed to be resolved as part of its winding down of operations at the property. R. 108 ¶¶ 130–131. Two weeks after Clean Harbors gave notice of its intent to terminate the leases, the Port District wrote to the IEPA stating it had not approved the Cap and Drain Plan. *Id*. ¶ 135. Later in 2012, the Port District demanded that Clean Harbors remove the engineered barrier discussed in the Plan, demanded it construct a truck yard on the property, and refused to grant it access to the property to remove certain improvements. *Id*. ¶ 140-42. The Port District also refused to complete forms required to wind down Clean Harbors' operations properly with the

IEPA. *Id.* ¶ 146. Finally, Clean Harbors alleges the Port District overcharged it quarterly rent payments from 2010 through 2012 totaling $315,000. *Id.* ¶ 78.

On February 19, 2013, Clean Harbors provided written notice to the Port District, the IEPA, and the U.S. Environmental Protection Agency ("EPA") of its intent to file a RCRA citizen suit against the Port District pursuant to 42 U.S.C. § 6972. The notice letter accused the Port District of violating the parties' IEPA permit by refusing to implement the Cap and Drain Plan, refusing to take financial responsibility for its share of the clean-up under the Plan, refusing to execute documents to allow for the closure of RCRA units (through Clean Harbors) at the property, and by demanding that the engineered barrier be removed in violation of the Cap and Drain Plan. R. 108-5 at 20-21. The notice letter also accused the Port District of violating the RCRA's endangerment provision (42 U.S.C. § 6972(a)(1)(B)) as the owner of the contaminated property. *Id.* at 21–22.

In December 2013, the Court stayed the case to allow the IEPA to approve Phase II of the Cap and Drain Plan. R. 65. In January 2017, the Court resumed proceedings. R. 98. Clean Harbors subsequently filed its Third Amended Complaint ("TAC") on October 10, 2017. R. 108. At issue in this dispute are Counts II, III, and VIII. In Count II of the TAC, Clean Harbors asserts a cause of action under the endangerment citizen suit provision of the RCRA, 42 U.S.C. § 6972(a)(1)(B). In Count III, Clean Harbors brings a citizen suit claim to abate RCRA permit violations under 42 U.S.C. § 6972(a)(1)(A). Both counts allege Clean Harbors provided pre-suit notice to the Port District on February 19, 2013. R. 108 ¶¶ 186,

215. In Count VIII, Clean Harbors alleges the Port District was unjustly enriched after it refused to return rent overpayments Clean Harbors made. *Id.* ¶¶ 237–244.

On October 31, 2017, the Port District filed a motion to dismiss Counts II, III, and VIII of the TAC under Fed. R. Civ. P. 12(b)(1) and 12(b)(6). As to the RCRA claims, the Port District argues Clean Harbors (1) failed to allege any facts showing it has an "injury in fact" to demonstrate standing under Article III of the Constitution; (2) failed to provide adequate pre-suit notice; and (3) failed to sufficiently allege RCRA violations under each provision. The Port District argues that Count VIII should be dismissed because Clean Harbors improperly bases its unjust enrichment claim on an express written contract.

## LEGAL STANDARD

A Rule 12(b)(6) motion challenges the sufficiency of the complaint. *See Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under the federal notice pleading standards, a plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007). Put differently, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (quoting *Twombly*, 550 U.S. at 570). "In evaluating the sufficiency of the complaint, [courts] view it in the light most favorable to the plaintiff, taking as true all well-pleaded factual allegations

and making all possible inferences from the allegations in the plaintiff's favor." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).

Rule 12(b)(1) authorizes the Court to dismiss any claim for which the Court lacks subject matter jurisdiction according to Article III, Section 2 of the U.S. Constitution. When a defendant challenges jurisdiction, the plaintiff bears the burden of establishing a court's jurisdiction. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992). As with 12(b)(6) motions, in deciding a Rule 12(b)(1) motion the Court must "accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff." *St. John's United Church of Christ v. City of Chi.*, 502 F.3d 616, 625 (7th Cir. 2007) (quotation marks omitted).

## DISCUSSION

### I.    RCRA (Counts II and III)

The RCRA was enacted to aid in a national policy to reduce or eliminate hazardous waste "as expeditiously as possible." 42 U.S.C. § 6902(b). Waste that cannot be eliminated "should be treated, stored, or disposed of so as to minimize the present and future threat to human health and the environment." *Id*. To help enforce this goal, Congress enacted a citizen-suit provision that allows "any person" to commence a civil action against alleged violators of the RCRA. 42 U.S.C. § 6972.

RCRA authorizes two general types of citizen suits. First, a plaintiff may commence a civil action against "any person . . . who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter." 42 U.S.C. § 6972(a)(1)(A). To

proceed under subsection (a)(1)(A), a plaintiff is generally required to provide 60 days advance notice to the EPA Administrator, the State in which the violation occurred, and the alleged violator. *Id.* § 6972(b)(1)(A) ("No action may be commenced under subsection (a)(1)(A) . . . prior to 60 days after the plaintiff has given notice of the violation to (i) the [EPA] Administrator; (ii) the State in which the alleged violation occurs; [and] (iii) to any alleged violator of such permit, standard, regulation, condition, requirement, prohibition, or order."). Second, a plaintiff may commence a civil action against "any person . . . who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." *Id.* § 6972(a)(1)(B). To proceed under subsection (a)(1)(B), a plaintiff is generally required to provide 90 days advance notice. *Id.* § 6972(b)(2)(A) ("No action may be commenced under subsection (a)(1)(B) . . . prior to ninety days after the plaintiff has given notice of the endangerment to (i) the [EPA] Administrator; (ii) the State in which the alleged endangerment may occur; [and] (iii) any person alleged to have contributed or to be contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste."). There are exceptions to these notice provisions, but they are not relevant here.

In Counts II and III, Clean Harbors brings both types of citizen suits. Count II, (the "Endangerment Claim"), is a claim under § 6972(a)(1)(B). Clean Harbors alleges that the Port District was at all relevant times the owner of the property

and (1) actively contributed to the contamination through the construction of the piers on the property; (2) knew and approved of hazardous waste handling, treatment, storage, and disposal activities at the property by Hyon Waste; and (3) presents an imminent and substantial endangerment to health and the environment through its demands that the engineered barrier be removed from the property. R. 108 ¶¶ 170, 171, 185. Clean Harbors alleges it issued a written notice and demand to the Port District, the EPA Administrator, and the IEPA as required by 42 U.S.C. § 6972(b)(2)(A) on February 19, 2013. *Id.* ¶ 186; *see also* R. 108-5 at 23-24.

In Count III, Clean Harbors brings a claim under § 6972(a)(1)(A) (the "Permit Claim"). Clean Harbors alleges the Port District violated the Permit by demanding that Clean Harbors remove engineered barriers approved as part of the Cap and Drain Plan; by refusing to implement and pay its fair share of the costs of the Cap and Drain Plan; and by obstructing Clean Harbors from accessing the Property to monitor ground water conditions in compliance with the Permit. R. 108 ¶¶ 197–201. Clean Harbors alleges these actions violate (i) Section 4 of Attachment I and Section V(C)(1) of the Permit; (ii) 35 Ill. Admin. Code §§ 724.201(a), 702.141 and 703.121(a)(2); and (iii) 40 C.F.R. §§ 264.101(a) and 270.30(a). *Id.* ¶ 202. Clean Harbors further alleges the Port District violated its permit obligations and 35 Ill. Admin. Code § 724.212(b)(4) by refusing to execute a modification form, and by disposing of hazardous waste through the construction of the piers without a permit in violation of 42 U.S.C. §§ 6924 and 6925, and 40 C.F.R. § 270.1(c). *Id.* ¶¶ 207, 213.

Clean Harbors alleges it provided a written notice and demand as required by 42 U.S.C. § 6972(b)(1)(A) on February 19, 2013. *Id.* ¶ 215.

## A. Article III Standing

To establish standing under Article III of the Constitution, Clean Harbors must plead: (1) a "concrete and particularized" injury in fact that may be either "actual or imminent;" (2) a causal connection between the injury and the conduct complained of; and (3) a likelihood that a favorable decision will result in a remedy for the plaintiff. *Lujan*, 504 U.S. at 560–61. The relevant showing for purposes of Article III standing is not injury to the environment but injury to the plaintiff. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

Further, "injury in fact" is loosely defined by courts as requiring a "personal stake in the outcome" of the litigation, (*see Sierra Club v. Morton,* 405 U.S. 727, 731–32 (1972)), or the "invasion of a legally protected interest" (*Lujan,* 504 U.S. at 560). "The injury in fact requirement precludes those with merely generalized grievances from bringing suit to vindicate an interest common to the entire public." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.,* 204 F.3d 149, 156 (4th Cir. 2000) (citing *Lujan,* 504 U.S. at 575.) A plaintiff must differentiate himself from the mass of people who may find the conduct of which he complains to be objectionable only in an abstract sense. *Id.* The alleged injury "must affect the plaintiff in a personal and individual way." *Id.*

The Port District appears to confuse Article III standing with standing under a statute. It argues Clean Harbors has failed to allege that "it has any concerns—health, environmental, aesthetic, recreational, injury, or otherwise," R. 116 at 1, and that monetary claims do not provide the "necessary injury-in-fact *under RCRA*," *Id*. at 2 (emphasis added). But Article III does not require nor bar specific injuries. Instead, it requires only that a plaintiff show it has an injury that is "concrete and particularized" enough to move beyond the world of individuals with only "generalized grievances." According to these standards, Clean Harbors has sufficiently alleged an injury in fact—it alleges it has incurred substantial costs due to the previous contamination of the property and continues to be injured due to the Port District's actions in violation of the Cap and Drain Plan. *See* R. 108 ¶¶ 86, 184–185, 198–216. Clean Harbors' injury is not the "generalized grievance" Article III intends to deter.

Neither of the cases the Port District cites support its argument. In *Premier Assocs., Inc. v. EXL Polymers, Inc.,* 2010 WL 2838497 (N.D. Ga. July 19, 2010), *aff'd in part*, 507 F. App'x 831 (11th Cir. 2013), the court found the counterclaimant did not have standing under the RCRA to bring a claim because he had no injury—his only allegations of harm were the *possibility* of being found liable under the RCRA claim brought by the plaintiff. *Id*. at *3. The counterclaimant had alleged no other injury other than that speculative fear. In *Doyle v. Town of Litchfield*, 372 F. Supp. 2d 288 (D. Conn. 2005), the court discussed monetary damages in the context of redressability—it did not discuss whether monetary damages are sufficient to

confer an injury in fact under Article III. In *Doyle*, because the plaintiff no longer had an interest in the property when he brought suit, neither an injunction to abate pollution nor civil penalties to deter pollution would have redressed his injuries. *Id.* at 302. The plaintiff's only possible redress was monetary damages in the form of past cleanup costs, which are not recoverable under the RCRA. Because the plaintiff's injuries could not be redressed, he had not pled an injury to confer standing under Article III. Here, however, Clean Harbors does not seek to recover its economic damages through its RCRA claims. Instead, because it is a co-permittee who alleges it will continue to suffer injury if the Port District is not enjoined, its injuries will be redressed by injunctive relief. *See Friends of the Earth,* 528 U.S. at 185–86 ("It can scarcely be doubted that, for a plaintiff who is injured or faces the threat of future injury due to illegal conduct ongoing at the time of suit, a sanction that effectively abates that conduct and prevents its recurrence provides a form of redress.").

Consequently, the Court concludes that Clean Harbors has established a basis for constitutional standing, and the Port District's motion to dismiss on that issue is denied.

## B. Pre-Suit Notice

The Port District next argues that Clean Harbors failed to meet the pre-suit notice requirements of the RCRA in regard to both its Endangerment and Permit claims. Specifically, the Port District argues Clean Harbors' pre-suit notice was deficient because: (1) it failed to give the Port District notice that it used

contaminated material to construct the piers (the "pier allegations"); (2) it failed to cite any regulations or sections of the RCRA permit provisions that the Port District violated (the "permit allegations"); and finally (3) it failed to notify the Port District of its obstruction of access to the property as alleged in ¶ 201 of Count III (the "obstruction allegation"). R. 112 at 5–6, 11–12; R.116 at 3.

The RCRA requires parties to notify a RCRA violator before commencing suit, but it does not specify what notice is required. 42 U.S.C. § 6972(b). The Supreme Court has held that notice under the RCRA is a requirement that may not be disregarded, but has also failed to provide any direction as to the contents of the notice. *See Hallstrom v. Tillamook Cty.,* 493 U.S. 20, 31 (1989). The Seventh Circuit, however, has provided guidance on what notice is required. In *Atlantic States Legal Foundation, Inc. v. Stroh Die Casting Co.*, 116 F.3d 814 (7th Cir. 1997),[2] the Court concluded that not every source of pollution must be identified in a notice, but rather that, "[i]n practical terms, the notice must be sufficiently specific to inform the alleged violator about what it is doing wrong, so that it will know what corrective actions will avert a lawsuit." 116 F.3d at 819. *See also N. Illinois Gas Co. v. City of Evanston, Illinois*, 162 F. Supp. 3d 654, 665 (N.D. Ill. 2016) (not requiring the plaintiff to identify "all aspects of an endangerment and the full extent of the endangerment," but requiring that the notice direct the violator's attention to the

---

[2] *Atlantic States* interpreted a nearly identical regulatory notice provision in the Clean Water Act. Because of the similarities between the notice provisions of the Clean Water Act and the RCRA, courts sometimes rely on cases interpreting one statute to interpret the other statute. *See N. Illinois Gas Co. v. City of Evanston, Illinois*, 162 F. Supp. 3d 654, 664 (N.D. Ill. 2016) (listing cases).

issue); *Mejdreck v. Lockformer Co.,* 2002 WL 1838141, at *9 (N.D. Ill. Aug. 12, 2002), *aff'd sub nom. Mejdrech v. Met-Coil Sys. Corp.,* 319 F.3d 910 (7th Cir. 2003) (a failure to refer to a degreaser system as "underground" did not fail to meet the notice requirements because it provided enough information to inform the violator of the non-compliance).

Further, Congress has authorized the EPA to oversee the implementation of the RCRA and to issue regulations with the force of law to support the RCRA's purposes. *See* 42 U.S.C. § 6912(a)(1); *City of Chicago v. Envtl. Def. Fund*, 511 U.S. 328, 330 (1994) (noting that RCRA implementing regulations come from the EPA). The EPA has promulgated several regulations that provide guidance in interpreting the RCRA, including in the interpretation of pre-suit notice requirements, as discussed below. *See* 40 C.F.R. § 254.3 (discussing pre-suit notice requirements for Permit claims).

### 1. Pier Allegations

The Port District argues that Clean Harbors failed to provide it with any notice of the pier allegations in its notice letter. The Court agrees. Clean Harbors' notice,[3] which is lengthy and cited verbatim in the footnote, only discussed the Port

---

[3] Relevant portions of the notice are as follows:

The Port District was, at all times, the owner of the Property. The Port District entered into a lease with one of its tenants, Hyon Waste, in the 1970s. As the Port District's tenant, Hyon Waste received approximately 68 million gallons of chemical waste and treated the waste in the ground on the Property. The Port District also allowed Hyon Waste to deposit the byproducts of this waste treatment on other portions of the Property, thereby contributing to the pollution at the Property. Moreover, as the Port District's tenant, Hyon Waste,

District's participation in the contamination caused by Hyon Waste. *See* R. 108-5 at 22. There is no indication from the notice that the problematic contamination stemmed from the piers built by the Port District. Indeed, the notice states that the Port District contributed only as the "landlord for the Property for Hyon Waste's historical pollution and contamination of the Property." *Id*. This notice failed to direct the Port District's attention to the piers as contaminants, and failed to meet the standards set out by the Seventh Circuit in *Atlantic States*. Clean Harbors' pier allegations in both Counts II and III are dismissed for failure to provide proper pre-suit notice.[4]

## 2. Permit Allegations

received "pickle liquor" or steel mill waste at the Property and the Port District allowed Hyon Waste to bury the "pickle liquor" in the ground at the Property. Further, while a tenant at the Property, Hyon Waste operated an incinerator illegally, causing the City of Chicago, Department of Environment to shut it down. The Port District benefitted financially from Hyon Waste's contamination of the Property and took no apparent action to abate the environmental contamination caused by Hyon Waste.

. . .

Through a joint RCRA facilities investigation, the Port District and Clean Harbors have demonstrated that Hyon Waste is a primary cause for the Work Plan at the Property. The Port District and Clean Harbors have identified the historical pollution at the Facility. The Port District was involved in the storage or disposal of the hazardous waste at the Property because it served as the landlord for the Property for Hyon Waste's historical pollution and contamination of the Property. The Port District failed to exercise the degree of care necessary for an owner with respect to Hyon Waste's pollution on the Property. These facts, together with the Port District's lack of cooperation with Clean Harbors and the IEPA to abate the historical contamination at the Property, its failure to implement the Work Plan and its failure to contribute its fair share of the clean-up costs presents a substantial endangerment to health and the environment. R. 108 at 21-22.

[4] Because the Court dismisses the pier allegations, it need not reach whether Clean Harbors alleged the piers contain "solid waste" to state a claim under the endangerment provision. *See* 112 at 9–11.

The EPA requires notice regarding a permit violation to include sufficient information to allow the recipient to (1) identify the specific permit, standard, regulation, condition, requirement, or order which has allegedly been violated; (2) the activity alleged to constitute a violation; (3) the person or persons responsible for the alleged violation; (4) the date or dates of the violation; and (5) the full name, address, and telephone number of the person giving notice. 40 C.F.R. § 254.3. In its notice letter, Clean Harbors met the first requirement by identifying the Permit and the specific sections allegedly violated. *See* R. 108-5 at 21 ("The Port District's conduct constitutes a violation of the Permit, including Attachment I of the Permit"). Contrary to the Port District's arguments, 40 C.F.R. § 254.3 does not require citation to "a single regulation or section of RCRA." R. 112 at 11. An identification of the "specific permit" is sufficient, which is what Clean Harbors provided. *See* R. 108-5 at 21.

Clean Harbors then specified the activities that caused the violation, including the Port District's refusal to implement the Cap and Drain Plan, its refusal to cooperate to execute Permit modifications, and its demand that the engineered barrier on the property be removed. *Id.* This provides notice to the Port District of the second requirement as well. The Port District does not argue that Clean Harbors failed to satisfy the remaining requirements of 40 C.F.R. § 254.3.

The Court finds Clean Harbors provided sufficient notice to the Port District to inform it "about what it is doing wrong" as to the permit allegations.[5]

### 3. Obstruction Allegation

Finally, the Port District argues that Clean Harbors' allegations that "the Port District has obstructed Clean Harbors from accessing the Property in order to monitor ground water conditions in compliance with the Permit" (R. 108 ¶ 201) were not included in the pre-suit notice and must be dismissed. Clean Harbors provided written notice to the Port District of certain violations on October 2, 2012 and provided notice of additional violations on February 19, 2013. R. 6-5 at 21; 108–5 at 19. The October notice accused the Port District of, among other things, refusing to grant Clean Harbors access to the property "for the purpose of allowing Clean Harbors to comply with conditions and requirements of the RCRA Permit, including monitoring the facility perimeter and systems." *Id*. The parties have not indicated that the previous notice letter is invalid or has been withdrawn. The Court finds that Clean Harbors' October notice that the Port District refused to grant it access to the property for purposes of monitoring sufficiently provided the Port District notice of the allegations in ¶ 201.

---

[5] The Port District's argument that Clean Harbors failed to provide it notice of violations of the final "Part B renewal permit which has an effective date of September 6, 2017" (R. 112 at 12) is misguided. The allegations indicated that the renewal was just that, *a renewal* of the Permit. Neither party has alerted the Court that the Permit and its renewal differed in any way or that the violations changed with the renewal. Accordingly, there is no reason to require Clean Harbors to provide a second, identical notice. Clean Harbors adequately notified the Port District of the violations of the Permit to meet the standards laid out in *Hallstrom* and *Atlantic States*.

## C. Failure to State RCRA Claims

### 1. RCRA Endangerment Claim (Count II)

RCRA's endangerment provision authorizes suit against "any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage or disposal facility, *who has contributed or is contributing* to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B) (emphasis added). The Seventh Circuit has interpreted the "has contributed or is contributing to" language of the RCRA to require active involvement and affirmative action rather than passive conduct. *Sycamore Indus. Park Assocs. v. Ericsson, Inc.,* 546 F.3d 847, 854 (7th Cir. 2008).

The Port District cites cases to support its argument that merely being an owner of the property is insufficient to find it was actively involved with the contamination. R. 112 at 8–9. But the Port District's cases dealt with owners of properties who had purchased the properties *after* the contamination, not with owners alleged to be actively involved in the contamination. *See e.g, Town & Country Co-Op, Inc. v. Akron Prod. Co.,* 2012 WL 1668154, at *4 (N.D. Ohio May 11, 2012) (dismissing successor property owner but refusing to dismiss claim against the previous owner who had allegedly contaminated the property); *Marriott Corp. v. Simkins Indus., Inc.*, 929 F. Supp. 396, 398 n.2 (S.D. Fla. 1996) (discussing dismissed RCRA claim against Marriot because it was a "subsequent purchaser of

previously contaminated property"); *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 263 F. Supp. 2d 796, 804 (D.N.J. 2003), aff'd, 399 F.3d 248 (3d Cir. 2005) (noting the defendants are the present owners and another party "actually deposited the contaminated material at the Site.")

Clean Harbors alleges the Port District was the owner of the property at the time of contamination and had an active role in the contamination—it alleges the Port District authorized Hyon Waste to contaminate; failed to hold Hyon Waste accountable for its contamination activities; and demands Clean Harbors remove the engineered barrier that prevents additional contamination. *See* R. 108 ¶¶ 51–53, 170–172, 185. Whether Clean Harbors can show the Port District's role with Hyon Waste was in fact active rather than passive is a matter for summary judgment or trial. At this stage, however, Clean Harbors' allegations are sufficient to plead that the Port District "contributed or is contributing to" the contamination to sustain its RCRA Endangerment Claim. *See Carlson v. Ameren Corp.,* 2011 WL 223015, at *2 (C.D. Ill. Jan. 21, 2011) (finding sufficient allegations of affirmative action when the counter-defendants prevented Ameren from accessing and repairing the land).[6] The Port District's motion to dismiss Count II is granted as to the pier allegations but denied in all other respects.

---

[6] The Port District argues that *Carlson* is wrongly decided and contradicts Seventh Circuit precedent in *Albany Bank and Trust Co. v. Exxon Mobil Corp.*, 310 F.3d 969 (7th Cir. 2002). R. 116 at 6. The Court disagrees. In *Albany Bank*, a district court dismissed a RCRA claim after the plaintiff refused to allow Exxon on the contaminated property. Exxon argued that the plaintiff's actions impeded investigation of the contamination and that the plaintiff had thus forfeited its right to have a federal court order an investigation under RCRA. *Id.* at 972. The Seventh

## 2. RCRA Permit Claim (Count III)

Because the Court finds that Clean Harbors failed to provide pre-suit notice as to the pier allegations, the issues remaining under Count III involve Clean Harbors' allegations that the Port District violated the Permit provisions by refusing to implement the Cap and Drain Plan, refusing to execute the closure forms, and by denying Clean Harbors access to the property. All the RCRA requires are allegations of (1) [a] violation of (2) any permit, standard, regulation, condition, requirement, prohibition, or order (3) which has become effective pursuant to the RCRA. 42 U.S.C.A. § 6972(a)(1)(A). As in its argument on the Endangerment Claim, the Port District fails to point to any case law that indicates "internal disputes between alleged co-permittees" or "mere demand[s]," R. 112 at 13, are not violations of the RCRA as a matter of law. Clean Harbors sufficiently alleges that the Port District violated a RCRA permit and states a plausible claim to meet the requirements provided by 42 U.S.C. § 6972(a)(1)(A). The Port District's motion to

---

Circuit reversed and held that the plaintiff prevented entry in an attempt to settle a dispute short of litigation, which was not sufficient to warrant dismissal of its RCRA claim. *Id.* at 973. The Court listed the requirements to bring a RCRA claim, finding that the plaintiff had made a prima facie case to meet them, and held that courts should not "infer additional [preconditions]" on plaintiffs "without evidence of contrary legislative intent." *Id.* In *Carlson*, on the other hand, the counterclaimant brought a RCRA claim against the plaintiff, and argued that the plaintiff's refusal to allow Ameren access to the property constituted affirmative action that allowed the hazardous material to further degrade the land, which the court found was sufficient to survive a motion to dismiss. *Carlson v. Ameren Corp.*, 2011 WL 223015, at *2 (C.D. Ill. Jan. 21, 2011). These cases have unrelated holdings. In *Albany Park*, the court found that obstructive actions by a plaintiff do not *bar* sufficiently pled RCRA claims. In *Carlson*, on the other hand, the court found that obstructive actions by a defendant are sufficient to *plead* RCRA claims.

dismiss Count III is granted as to the pier allegations but denied in all other respects.

## II.   Unjust Enrichment (Count VIII)

In Count VIII, Clean Harbors alleges the Port District overcharged it for rental payments. Specifically, Clean Harbors alleges the parties entered into an amendment of the lease, which required Clean Harbors to pay the Port District a percentage of its gross annual revenues. R. 108 ¶ 76. The payments were set to expire in 2009, but the Port District continued to charge Clean Harbors through 2012, in an amount totaling $315,000. *Id* ¶ 78. Clean Harbors alleges the Port District has refused to return the overcharge, even after Clean Harbors sent a demand letter. *Id*. ¶¶ 80, 241.

As a general rule, parties may not bring unjust enrichment claims where a contract governs. *See Utility Audit Inc. v. Horace Mann Srvc. Corp.*, 383 F.3d 683, 688-89 (7th Cir. 2004) ("When two parties' relationship is governed by contract, they may not bring a claim of unjust enrichment unless the claim falls outside the contract.") Illinois courts, however, have allowed unjust enrichment claims based on payments that were not included in the contract. *See e.g., Stark Excavating, Inc. v. Carter Const. Servs., Inc.*, 2012 IL App (4th) 110357, ¶ 38; *see also Fifth Third Bank v. Automobili Lamborghini S.P.A.*, 2011 WL 307406, at *4 (N.D. Ill. Jan. 26, 2011) ("Thus, under Illinois law, a party may pursue an unjust enrichment claim for a mistaken payment, even where a contract governs the relationship between the parties, if the payee is not, in fact, entitled to payment.").

Clean Harbors argues the overcharges were not part of the lease agreement after 2009 and are not barred under a theory of unjust enrichment. R. 116 at 15. Indeed, the lease amendment discusses quarterly payments only through 2009, R. 108-3 at 35, and neither the lease nor the subsequent amendments discuss overpayments. *See generally*, R. 108-3. Because Clean Harbors has alleged that its payments were mistaken, were improperly withheld, and are not covered under the lease and its amendments, R. 108 ¶¶ 239–240, the Court finds Clean Harbors' allegations are sufficient to bring an unjust enrichment claim under Illinois law. The Port District's motion to dismiss Count VIII is denied.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss the Third Amended Complaint, R. 111, is (1) granted as to pier allegations in Counts II and III and (2) denied in all other respects.

ENTERED:

Dated: February 15, 2018            Honorable Thomas M. Durkin
                                    United States District Judge